UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| SHAWN BERNARD CLARKE, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:12-cv-82 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| TROOPER ROBERT L. WILLS, | ) | |
| | ) | |
| Defendant. | ) | |

## **M E M O R A N D U M**

Before the Court is Defendant Trooper Robert L. Wills's ("Trooper Wills") motion for summary judgment (Court File No. 41). Trooper Wills seeks summary judgment on Plaintiff Shawn Bernard Clarke's ("Clarke") claims related to a traffic accident investigation that progressed into a search. Trooper Wills argues Clarke was not seized before the search and, even if he was, the "stop" was not unlawfully prolonged to accommodate a search. Clarke responded in opposition (Court File No. 49), alleging that he was seized in the midst of the accident investigation. For the following reasons, the Court agrees with Trooper Wills that Clarke was not seized, the subsequent search was supported by probable cause, and none of Clarke's rights was violated. Accordingly, the Court will **GRANT** Trooper Wills's motion for summary judgment (Court File No. 41).

### I.     FACTUAL AND PROCEDURAL BACKGROUND

For the most part, the parties do not dispute the facts in this case. On March 6, 2011, Clarke was involved in a hit and run at mile marker 39 on Interstate 26 in Unicoi County, Tennessee (Court File No. 41-7, Wills Aff., ¶ 3). At approximately 11:30 p.m., Clarke's vehicle was struck by another driver who subsequently fled the scene (Court File No. 41-8, Clarke Dep., p. 24). Clarke stopped at the scene on the shoulder of Interstate 26 (*id.* at pp. 32-33). Wills was dispatched shortly

thereafter, but he was in Butler, Tennessee at the time (Court File No. 41-7, Wills Aff., ¶ 3). Unicoi County Sheriff's deputies were dispatched to the scene and were the first to arrive.

Meanwhile, Trooper Wills first responded to Exit 22 of Interstate 26, where law enforcement had stopped the other driver, who was eventually arrested for driving under the influence (*id.* at ¶ 6). Trooper Wills remained at Exit 22 during the completion of a field sobriety test and then processed the scene, called for a towing service, photographed the vehicle, and conducted an inventory of the vehicle's contents (*id.* at ¶ 7). The tow service arrived at approximately 12:53 a.m. and, after the vehicle was secured, Trooper Wills proceeded to mile marker 39 where Clarke was waiting (*id.*).

Trooper Wills arrived at the scene at 1:25 am, approximately two hours after the accident occurred (Court File No. 41-7, Wills Aff., ¶ 9). After Trooper Wills arrived, Clarke and his passenger informed Trooper Wills that they were traveling to Georgia, either from New York or Massachusetts (*id.* at ¶ 28); (Court File No. 51-1, Clarke Dep., p. 51). Clarke was driving a rental car from New York and stated that he worked for a landscaping company in Massachusetts (Court File No. 41-7, Wills Aff., ¶ 10). Although there was only one other passenger in the vehicle, Wills observed at least three cell phones (*id.*). Also in the vehicle was a pit bull who appeared to suffer from mange (*id.*). Clarke called the passenger his brother, but according to Wills they spoke with different accents, were separated by approximately ten years in age, and had different last names (*id.*). In fact, the passenger is not Clarke's brother but is his cousin (Court File No. 41-8, Clarke Dep., pp. 61-62). A sheriff's deputy told Wills that what Clarke told Wills differed from what Clarke had told the deputy, but the sheriff's deputy apparently refused to explain what was different about the story (Court File No. 41-9, Wills Dep., p. 15).

2

At this point, Trooper Wills called his supervisor to obtain a K9 unit in order to sniff Clarke's vehicle (*id.* at ¶ 11). Although no unit was immediately available, a K9 unit from a neighboring county was eventually dispatched to the scene (*id.*). In the interim, Trooper Wills proceeded with his investigation (*id.*). In addition to interviewing Clarke, he ran driver's license information, completed the accident report paperwork, assessed and photographed the vehicle, evaluated pictures of the two cars, ran license plate information, investigated portions of I-26 leading up to where Clarke pulled to the shoulder, sought the accident location, took photographs, and completed field notes and sketches for the accident report (*id.* at ¶ 13). This investigation occurred between 1:25 am and 2:18 am.

Around 2:00 am, Deputy Joe Holsclaw of the Carter County Sheriff's Department arrived at the scene with his K9 unit and conducted a "sniff" of Clarke's vehicle (Court File No. 41-5, Holsclaw Aff., ¶¶ 7, 9). The K9 unit detected drugs near Clarke's trunk and driver's seat (*id.* at ¶ 12). This occurred approximately ten minutes after Deputy Holsclaw arrived at the scene (*id.* at ¶ 13) and no later than 2:18 am (Court File No. 41-2, Barry Aff., Ex. 1, p. 4) (dispatch record indicating the "K-9 UNIT HAS MADE HIT ON THE VEHICLE/UNIT 34" at 2:18:05 am).[1] The officers then informed Clarke the K9 had alerted. Trooper Wills claims that Clarke gave consent to search his vehicle (Court File No 41-3, Garrison Aff., ¶ 12). Clarke, on the other hand, states that he does not know whether he or his brother gave consent, although he concedes that it "could have been said" (Court File No. 51-1, Clarke Dep., p. 138). Regardless, Animal Control was called to the scene to secure Clarke's pit bull before the car was searched (Court File No 41-3, Garrison Aff.,

---

[1] The actual dispatch record records the events according to central time, although the events occurred in the eastern time zone.

¶ 13).

After Animal Control arrived, Trooper Wills moved Clarke and the passenger to the rear seat of his patrol car (Court File No. 41-7, Wills Aff., ¶ 17). They sat on the driver's side and passenger's side, respectively (*id.*). After searching Clarke's vehicle, no narcotics were found (*id.*). However, upon return to his patrol car, Trooper Wills discovered a plastic baggy with white powder in the rear seat on the driver's side of the vehicle (*id.*). Deputy Holsclaw performed a field test on the substance in the baggy, which tested positive for cocaine (Court File No. 41-5, Holsclaw Aff., ¶¶ 19-21). Trooper Wills had checked and cleaned the rear seat on March 6, 2011, (Court File No. 41-8, Wills Dep., p. 30), and Clarke and his passenger were the only occupants of the rear seat of Trooper Wills's patrol car since he cleaned it (Court File No. 41-7, Wills Aff., ¶ 18). Trooper Wills subsequently arrested Clarke for possession of a Schedule II controlled substance.

Clarke filed the instant suit on March 7, 2012. The case was then stayed pending state criminal proceedings (Court File No. 19). After the State of Tennessee dismissed the criminal charges, the Court lifted the stay (Court File No. 26). Clarke brings a 42 U.S.C. § 1983 claim and alleges that he was searched and seized in violation of his Fourth Amendment rights. Additionally, he asserts a malicious prosecution claim against Trooper Wills.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most

4

favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III. DISCUSSION**

Plaintiff brings two claims. First, Clarke asserts a cause of action under 42 U.S.C. § 1983 and alleges Trooper Wills violated his rights under the Fourth Amendment. Second, he brings a wrongful prosecution claim against Trooper Wills. The Court will consider each in turn.[2]

**A. Section 1983**

To state a general claim under 42 U.S.C. § 1983, a plaintiff must "demonstrate that a person

---

[2] Trooper Wills also argues Clarke is barred by the statute of limitations because he filed on March 7, 2012 but the initial accident, and subsequent interaction with law enforcement, occurred at 11:30 pm on March 6, 2011. The Court agrees with Clarke, however, that the claim did not accrue until the early-morning hours of March 7, 2011 and the claim was timely filed.

5

acting under color of state law 'deprived [her] of rights, privileges or immunities secured by the Constitution or laws of the United States.'" *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). Clarke argues he was unlawfully seized when a Unicoi County Sheriff's Deputy took his license and instructed him to wait at the accident scene. He suggests the circumstances leading to his arrest should be "analogized" to a traffic stop, which was unlawfully prolonged to accommodate a search.

Clarke relies almost exclusively on *State v. Berrios*, 235 S.W.3d 99 (Tenn. 2007) for the proposition that an initially lawful interaction with law enforcement can become unlawful if it is prolonged to accommodate a search. In *Berrios*, the defendant was stopped by law enforcement for speeding in a construction zone. After he pulled over, the officer instructed the defendant to step out of his vehicle, ostensibly for safety reasons. The officer then frisked the defendant, led him to the backseat of his vehicle, and questioned him, ultimately obtaining consent to search his vehicle. During the subsequent search, the officer discovered a large amount of cocaine.

The Tennessee Supreme Court held that, although the initial stop was lawful, the officer violated the defendant's Fourth Amendment rights when the officer frisked and placed the defendant in the patrol car. "The duration of [a traffic] stop . . . must be 'temporary and last no longer than necessary to effectuate the purpose of the stop.'" *Id.* at 106 (quoting *State v. Cox*, 171 S.W.3d 174, 179-80 (Tenn. 2005)). "The proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 106-07 (quoting *Cox*, 171 S.W.3d at 179-80) (internal quotation marks omitted). "A traffic stop may be deemed 'unreasonable,' if the 'time, manner or scope of the investigation exceeds the proper parameters.'" *Id.* at 107 (quoting *Cox*, 171 S.W.3d at 179-80).

6

Ultimately the court concluded that the officer frisked the defendant and placed him in the back of his patrol car without suspicion of danger. *Id.* at 108 ("Without any suspicion that the Defendant was armed or dangerous, the officer frisked the Defendant and placed him in the back of the patrol car before checking the validity of his driver's license or vehicle registration."). The officer placed the defendant in the patrol car, not for any fear of safety, but to see if he became more nervous. *Id.* The court thus held that the officer had no reasonable basis for placing the defendant in his patrol car or to perform a frisk. *Id.* at 109 ("Officer Nichols lacked a reasonable basis for placing the Defendant into the secured area of his patrol car and also lacked an independent basis for the frisk."). Because he was unlawfully detained, the subsequent search was also unlawful. *Id.* at 110.

*Berrios* is very different from this case. Unlike *Berrios*, this case was not predicated on a traffic stop. Rather, Clarke pulled to the shoulder voluntarily, although also in compliance with provisions of the Tennessee code that require drivers involved in accidents to remain at the scene long enough to provide certain identifying information. *See* Tenn. Code Ann. §§ 55-10-102, 103. Trooper Wills, and other law enforcement officers, were investigating the accident for the purpose of completing a police report. Until the dog alerted on Clarke's vehicle, there was no frisking and no removal of Clarke from the vehicle. None of the aspects that made the confrontation unlawful in *Berrios* is present here.

If Clarke cites *Berrios* for the proposition that a lawful stop can be made unlawful by later circumstances, the Court agrees. With respect to traffic stops, which Clarke argues are analogous to his situation, "an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well

7

within the bounds of the initial stop.'" *United States v. Campbell*, 511 F. App'x 424, 428 (6th Cir. 2013) (quoting *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999)). But prolonging an initial traffic stop *after* it has concluded is considered an unreasonable extension of an otherwise lawful stop. *United States v. Stepp*, 680 F.3d 651, 661-62 (6th Cir. 2012) (citing *United States v. Everett*, 601 F.3d 484, 492 n.9 (6th Cir. 2010)). Because such a rule is open to abuse, in that "a crafty officer, knowing this rule, may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, [courts] also treat the unreasonable *extension* of a not-yet-completed traffic stop as a seizure." *Id.* at 662 (emphasis added).

This case, however, does not involve a traffic stop. "Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).[3] This is precisely the type of interaction at issue here. It was the other driver who was being investigated for violation of a criminal statute, not Clarke. Clarke was never instructed to pull over by police and was not being investigated for criminal activity. Clarke's interaction with law enforcement is not analogous to a traffic stop.

A seizure occurs when a reasonable person would not feel free to leave an encounter with the police. *Florida v. Bostick*, 501 U.S. 429, 438-39 (1991); *United States v. Campbell*, 486 F.3d

---

[3] To be clear, the Court does not cite *Cady* to suggest that the search of Clarke's vehicle was part of Trooper Wills's "community caretaking function." As discussed below, the Court concludes the search was supported by probable cause based upon the K9 Unit's detection of drugs in the vehicle. Rather, the Court cites *Cady* merely to indicate that not every interaction between law enforcement and a citizen raises constitutional concerns and that investigation of traffic accidents is frequently one such type of interaction. The Court ultimately concludes Clarke was not seized because he remained at the scene voluntarily in order to obtain a police report.

8

949, 956 (6th Cir. 2007); *Bennett*, 410 F.3d at 834. In a typical seizure, this occurs when a government actor has, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Terry*, 392 U.S. at 19, n.16). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). There must be "a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998); *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006). In determining whether a seizure has occurred, some relevant factors to consider include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Clarke argues "[t]he fact that [Clarke's] driver's license was taken by the Unicoi County deputy and was told to stay at the scene was tantamount to [Clarke] being stopped by law enforcement on the roadways of the state." However, Clarke's testimony conflicts with this argument:

> [The first responder] showed up, and he started asking me some questions. So I said to him, I'm going to wait right here. I'm not going to go anywhere. Don't you think you should go down there and try to find the other guy, make sure he's okay, and if he even have a license because I think he's drunk.
> Okay. He said to me and my brother, Wait right here. We'll see what's going on, and we'll come back.
> When he went I think another officer slowed down, and I told him that they went that way. They came back probably 45 minutes or an hour or something after we first

9

> made contact and said that they found the driver some 15 miles away from where the accident took place.
> So I said to them, Well, I need a police report, and I need to get this guy's name and to find out if he have any insurance.
> They said to me, In Tennessee we do things a little different. You know, why do I need a police report?
> I said, This is an accident. That's what you do. You need police reports.
> He said, Okay. Well, he will not be the one issuing it. I will have to wait. He will relay the message or something like that, something of that nature.
> Anyway, we was there waiting. A few hours went by. He came back. I'm not sure at that time he came back he took our driver's license. But he was there with us for a while.

(Court File No. 41-8, Clarke Dep., pp. 26-27). Not only was Clarke's interaction with law enforcement "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady*, 413 U.S. at 441, but Clarke voluntarily waited at the accident scene while law enforcement pursued the other driver. Further, Clarke's testimony demonstrates he requested that law enforcement complete a police report and voluntarily remained at the scene until the report was completed. Clarke was therefore not seized when law enforcement first reported to the scene or after they began producing the accident report.

Moreover, even if this case were analogous to a traffic stop, there was no "prolonging" or unreasonable extension until after the drug dog alerted to the presence of narcotics in Clarke's vehicle. In the process of completing the accident report, Trooper Wills's suspicions were raised and he sought a K9 Unit. Assuming such a unit was unavailable, Trooper Wills continued on in his duties related to the accident investigation. In the interim, a K9 Unit arrived and performed a "sniff" of Clarke's vehicle simultaneous with Trooper Wills's completion of his investigation. Clarke argues that the duration of the investigation (approximately two and one-half hours) "was anything but temporary and lasted much longer than the purpose of the stop." But Clarke provides no support for this contention. The only evidence in the record suggests that Trooper Wills was diligently

10

undertaking investigation of the accident while the K9 Unit performed a sniff on Clarke's vehicle. Accordingly, the Court concludes that Clarke was not unlawfully seized prior to the dog alerting to the presence of contraband in his vehicle.

Clarke also claims the search of his vehicle was unlawful. He primarily argues the search was unlawful because the "stop" (which was really an accident investigation) was itself unlawful. Because the Court concludes that Trooper Wills and the other officers did not unlawfully seize Clarke, the Court also rejects this argument.

Once the dog alerted on Clarke's car, Trooper Wills and the other officers had established probable cause supporting the search.[4] "It is well-established in this Circuit that an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle." *United States v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999). Deputy Holsclaw and his dog, Max, have been certified and trained by the U.S. Police Canine Association (Court File No. 41-4, Carlock Aff., Ex. 1). Deputy Holsclaw had worked with Max for several years prior to Max's use in this case (Court File No. 41-5, Holsclaw Aff., ¶ 10). Max regularly received perfect scores in accuracy during evaluations (*id.*). Clarke has not presented any evidence suggesting that Max was unreliable. This is sufficient to establish Max's reliability. *See United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) ("Gilman testified to the dog's considerable training and prior certifications, which is sufficient to establish his reliability."). In light of the record, probable

---

[4] Because there was no "detention" there is no requirement that a dog sniff be performed with reasonable suspicion or probable cause. *United States v. Dyson*, 639 F.3d 230, 233 (6th Cir. 2011) ("[W]here there is no detention, officers may conduct a dog sniff on a vehicle without reasonable suspicion that criminal activity is afoot.").

11

cause to search Clarke's vehicle was established when Max alerted.[5] *See id.* ("Because Emir is reliable and actively alerted to the van (i.e. he scratched at the location where the cocaine was subsequently found), the government established probable cause for a search of the van."); *Hill*, 195 F.3d at 274 ("Deputy Whitlock therefore had probable cause to search the U–Haul inasmuch as Spanky gave a positive alert to the presence of drugs when Deputy Whitlock ran the canine search.").

Because Trooper Wills and the other officers had probable cause to search Clarke's vehicle, they also had a limited authority to detain Clarke during the search. *Wlkerson v. City of Chattanooga*, No. 1:09–cv–168, 2010 WL 2735689, at *8 (E.D. Tenn. July 12, 2010) ("Defendant Lockhart was also entitled to place Plaintiff in handcuffs and briefly detain him during the search of Plaintiff's vehicle."); *see also United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000) ("Law enforcement officials have a limited authority to detain occupants of a premises while a proper search is being conducted."). After the search produced no evidence of criminal conduct, Trooper Wills removed Clarke and his passenger from his backseat. When he subsequently found contraband where Clarke had been sitting, Trooper Wills had probable cause to arrest Clarke for a violation of Tenn. Code Ann. § 39-17-418, which criminalizes possession of a controlled substance.

Accordingly, the Court concludes that Trooper Wills did not violate Clarke's Fourth Amendment rights. The initial interaction was not based upon a traffic stop or for any investigatory purpose. At the time that Trooper Wills's suspicions were raised, Clarke was present on the scene voluntarily, awaiting the production of a police report that he requested. Clarke has presented no

---

[5] The Court therefore need not consider whether a question of fact exists regarding Clarke's consent or lack thereof.

evidence that Trooper Wills improperly prolonged his investigation to accommodate the arrival of a K9 Unit. Once the K9 Unit arrived, the dog alerted on Clarke's vehicle, which established probable cause for the search. When Trooper Wills later discovered contraband in his rear seat, he had probable cause to arrest Clarke. The Court will therefore **GRANT** Trooper Wills's motion for summary judgment on this claim.

### B. Malicious Prosecution

In light of the grand jury indictment the State of Tennessee obtained against Clarke, he concedes that he cannot establish a malicious prosecution claim. *See Powers v. Wallen*, No. 3:12–CV–96, 2014 WL 1491213, at *14 (E.D. Tenn. Apr. 15, 2014) (discussing recent Tennessee cases on this issue). Accordingly, the Court will **GRANT** Trooper Wills's motion on this claim as well.

### IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** Trooper Wills's motion for summary judgment (Court File No. 41).

**An order shall enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**